# EXHIBIT A



# CSC

## Notice of Service of Process



| | |
|---|---|
| **Entity:** | Shellpoint Mortgage Servicing<br>Entity ID Number ▮▮▮ |
| **Entity Served:** | Shellpoint Mortgage Servicing |
| **Title of Action:** | Heather Davis vs. Bank of America |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Barnstable County Superior Court, Massachusetts |
| **Case/Reference No:** | 1772CV00306 |
| **Jurisdiction Served:** | Massachusetts |
| **Date Served on CSC:** | 07/20/2017 |
| **Answer or Appearance Due:** | 20 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Robert K. Cabana<br>617-405-4283 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

COMMONWEALTH OF MASACHUSETTS
SUPERIOR COURT DEPARTMENT
BARNSTABLE SUPERIOR COURT

BARNSTABLE, ss                                    Docket no.

HEATHER DAVIS
                    PLAINTIFF

V.

BANK OF AMERICA, GREENPOINT MORTGAGE CORPORATION,
SHELLPOINT MORTGAGE SERVICING

                    DEFENDANTS

COMPLAINT

INTRODUCTION

COMPLAINT AGAINST, BANK OF AMERICA, GREENPOINT MORTGAGE

CO RPORATION AND SHELLPOINT MORTGAGE FOR FRAUD IN THE

ORIGINATION OF THE MORTGAGE AS THE BROKER LIED ABOUT THE

INITIAL TERMS OF THE MORTGAGE THE BROKER FAILED TO FOLLOW

THROUGH ON THE ORIGINAL MORTGAGE AND AT THE LAST MINUTE

SLIPPED ANOTHER MORTGAGE IN AT THE REGISTRY OF DEEDS. THE

MORTGAGE COMPANY CONTINUED TO ESCROW FOR TAXES AND

INSURANCE EVEN THOUGH THE AGREEMENT STATED THAT THE

(2)

PLAINTIFF WOULD BE UNTIL IT BECAME FUTILE TO CONTINUE. THIS

CAUSED THE PLAINTIFF TO SEE THE MONTHLOY CHARGES TO GO UP

CONSIDERABLY. VIOLATIONS OF THE MASSACHUSETTS CONSUMER

PROTECTION ACT. IN THE ORIGINATION FOR SELLING A LOAN WHICH THE

ENTITY MAKING THE LOAN KNEW OR

SHOULD HAVE KNOWN THAT THE PLAINTIFF COULD NOT AFFOPRD THE

DOUBLE PAYMENTS. THIS IS A DIRECT VIOLATION OF CONTRACT LAW
AND MORTGAGE LAW AND CONSUMER PROTECTION LAW. THE COSTS
WOULD HAVE BEEN GREATLY DECREASED IF SUCH PAYMENTS HAD
CONTINUED TO BE MADE DIRECTLY BY THE PLAINTIFF AND THE
MORTGAGE WOULD HAVE BEEN AFFORDABLE. IT PUT THE PLAINTIFF IN A
HOLE THATM SHE WAS EVENTUALLY UNABLE TO DIG HER WAY OUT OF.
. UNFAIR AND DECEPTIVE ACTS BY LURING PLAINTIFF INTO

ACCEPTING THE MORTGAGE WITH THE ASSURANCE HE COULD

REFINANCE WITHIN A SHORT PERIOD OF TIME.

VIOLATIONS OF MASSACHUSETTS PREDATORY LENDING HOME

LOANS PRACTICES ACT. UNCONSCIONABLE CHARGES FOR SETTLEMENT

CHARGES, YIELD SPREAD PREMIUMS AND VIOLATION OF FEDUCIARY

DUTIES. VIOLATIONS OF FEDERAL AND STATE LAWS BY CHARGING

EXCESSIVE PREMIUMS FOR INSURANCE AS STATED BEFORE.

 FAILURE TO FOLLOW FEDERAL

AND STATE LAWS WHEN ASSIGNING MORTGAGE. THE SPLITTING OF THE

NOTE FROM THE MORTGAGE BY MORTGAGE ELECTRONIC

REGISTRATIONS SYSTEMS, INC THUS NULLIFYING THE ORIGINAL

(3)

MORTGAGE. THE FAILURE OF ANY ENTITY ATTEMPTING TO ENFORCE

THE OBLIGATIONS OF THE MORTGAGE TO PRODUCE A VALID NOTE

PROPERLY ASSIGNED TO JUSTIFY COLLECTION RIGHTS OR ANY RIGHTS.

 FOR MANY REASONS THE ABOVE MENTIONED

MORTGAGE COMPANIES VIOLATED THEIR DUTIES UNDER THE FEDERAL

MAKING HOME AFFORDABLE PROGRAM (HAMP) TO LIVE UP TO THE

CONTRACT OBLIGATIONS TOWARDS THE PLAINTIFF AS A THIRD PARTY

INTENDED BENEFICIARY UNDER PARKER V. BANK OF AMERICA. THE

PLAINTIFF APPLIES SEVERAL TIMES FOR MODIFICATION. THE

DEFENDANTS DID NOT DEAL AT ALL IN GOOD FAITH AND CONSTANTLY

LOST DOCUMENTS OR DID NOT FOLLOW THROUGH ON THEIR

REQUIREMENTS UNDER THE CONTRACT OR LAWS. THEY FAILED TO

NOTIFY THE PLAINTIFF OF HER STATUS. THEY EITHER NEVER ACTED ON

THE NUMEROUS APPPLICATIONS OR MISTAKENLY TURNED THE PLAINTIFF

DOWN. AS THE ABOVE NAMED CASSE STATES "INERTIA IS NOT AN

OPTION" IN DEALING WITH THE REQUIREMENTS OF THE HAMP. THE

DEI FENDANTS HAVE NOT PRODUCED ANY NOTE TO JUSTIFY COLLECTION

RIGHTS OR FORECLOSURE RIGHTS. THE DEFENDANTS LACKED LEGAL

STANDING TO CARRY OUT ANY

FORECLOSURE ACTION AS THEY WERE NOT PROPERLY ASSIGNED THE

MORTGAGE THEY CANNOT PRODUCE THE ORIGINAL MORTGAGE NOTE TO

JUSTFY COLLECTION AND FORECLOSURE RIGHTS; THE DEFENDANTS A

(4)

MORTGAGE THEY HAD REASON TO KNOW SHE COULD NOT AFFORD
ALSO, THE DEFENDANTS DID NOT MARKET THE PROPERTY OR IN ANY
WAY ATTEMPT TO PROTECT THE EQUITY OR AS A TRUSTEE FOR THE
BENEFIT OF THE HOMEOWNER. ALSO, FOR BAIT AND SWITCH. PLAINTIFF
WAS ORIGINALLY PROMISED A FIXED RATE MORTGAGE AT A LOWERR
INTEREST RATE AND HIGHER PRINCIPLE THAN WAS DELIVERED.. FAILURE
UNDER MASACHUSETTS LAW TO DISCLOSE TO A BUYER FACTS THAT
WHICH MAY HAVE INFLUENCED THE BUYER NOT TO ENTER INTO THE
TRANSACTION, SUCH AS THE ESCROWING. THIS IMPROPER ESCROWING
ADDED ALMOST 40% TO THE MONTHLY MORTGAGE PAYMENT CHARGES
VIOLATIONS OF MASSACHUSETTS GENERAL LAWS CHAPTER 234,
SECTIONS 35A, 35B, AND 35C. THE PLAINTIFF WAS NOT PROPERLY
NOTICED AS TO HER 150 DAY RIGHT TO CURE. IN FEBRUARY 22, 2017 AS
PART OF A LARGER AFFIDAVIT, REPRESENTATIVES OF SHELLPOINT
STATED THAT THEY HAD TAKEN "REASONABLE STEPS AND MADE A GOOD
FAITH EFFORT TO AVOID FORECLOSURE". IN ACTUALITY, THEY AND
OTHERS HAD LOST DOCUMENTS, CAUSED UNNECESSARY DELAYS,
CONSTANTLY CHANGED POINT PEOPLE TO WORK WITH AND NEVER MADE
A DECISION ON MODIFICATION AT THE TIME THE AFFIDAVIT WAS SIGNED.
THER LAW CLEARLY REQUIRES A GOOD FAITH EFFORT AND A DEDISION
AS FAST AS POSSIBLE. AT NO POINT DID THEY RESPONDING 30 DAYS
AFTER APPLICATION WITH A WRITTEN STATEMENT REGARDING DEBTS,

(5)

INCOME AND OBLIGATIONS.  EVEN MORE IMPORTANT THE MORTGAGE

COMPANIES NEVER RESPONDED WITH A NET PRESENT VALUE ANALYSIS

OF THE MORTGAGE LOAN, A STATEMENT OF INTEREST OF THE CREDITOR

OR A MODIFIED MORTGAGE OR A STATEMENT THAT NONE WOULD BE

OFFERED.  THEREFORE AS OF FEBRUARY 22, 2017, AS WELL AS, TODAY THE

AFFIDAVIT WAS FALSE.

PARTIES

.  Heather Davis Plaintiff, is located at 34 Eric's Way, Unit 5, Wellfleet, MA 02667.

2. Defendant, Bank of America is located at 100 North Tryon St.

Charlotte, North Carolina 28202

3. Defendant, Greenpoint Mortgage Corporation is located at 100 Wood Hollow Drive

Novato, CA 94945

4. Defendant, Shellpoint Mortgage Servicing is located at 55 Beattie Place, Suite 500,

MS-501 Greenville, SC 29601.

FACTUAL BACKGROUND

5. Heather Davis brings this suit, as a Massachusetts plaintiff, to challenge the

failure of Defendants  to honor its agreements with the borrower to modify the

mortgage under the Home Affordable Modification Program; and since the end of the

HAMP program on December 30, 2016 to allow the completion of an orderly

modification of her mortgage in order to correct the mortgage's origination issues and

servicing issues. And, prevent the foreclosure on her property located at 21 Dewey

Avenue #2, Provincetown, Massachusetts.

(6)

6. Her first mortgage issued by Greenpoint through as broker, was improperly changed at the last minutes to a higher interest and lower principal and presented to her at the closing on a take-it-or leave it basis. Once the mortgage was in place Greenpoint and others committed unfair a deceptive acts and violated contract and mortgage law by going against their own agreement with the plaintiff and escrowing for taxes and insurance at rates that caused the Plaintiff's payments to go up considerably and over time. In fact the monthly payment went up hundreds of dollars. The double payments caused the plaintiff, along with income issues, to fall behind on an increasingly expensive mortgage payment and to get in the hole and eventually face default and potential foreclosure.

The Plaintiff was referred to the mortgage broker by the realtor. The Plaintiff applied for modification under the Federal Making Home Affordable program (HAMP)

7. The plaintiff applied under said programs more than several times over several years several times. She was essentially fumbled around several times by different mortgage companies

8. Some of the Plaintiff's other claims are also simple- when financial institution accepts an application to modify a loan to prevent a foreclosure, under the Making Home Affordable Program (HAMP), the lender must treat the application in a non-negligent manner. Foreclosure activity must stop and the lender must follow through and meet the strict deadlines to make a determination. Inertia is not an option. Defendants have violated the Plaintiff's rights as a third party beneficiary under the federal contract between the government and Defendants under the HAMP, as the institution is acting under the purported aegis of a federal program that is specifically targeted at preventing

(7)

foreclosures.

9. The Plaintiff's other claims are simple as well- when a large financial institution
promises to modify a loan to prevent foreclosure who lives up to his end
of the bargain, expect that promise to be kept. This is especially true when the financial
institution Shellpoint and others are acting under the purported aegis of a federal
program that is specifically targeted at preventing foreclosures. This program expired on
December 30, 2016.

10. Multiple efforts by the Plaintiff to resolve her mortgage difficulties caused by the
Defendants' wrongdoing resulted in more frustrated efforts. As stated before, the
defendants then had the nerve to file affidavits under M.G.L. Chapter 244, sections 35 A,
B and C indicating that they took reasonable steps to avoid foreclosure.

11. In October 2008, the lending institutions cited above accepted billions in funds from
United States Government as part of the Troubled Asset Relief Program (TARP). They
signed a contract with U.S. Treasury agreeing to participate in the Making Home
Affordable (HAMP) program- a program which the mortgagees received incentive
payments for providing mortgage loan modifications and other alternatives to foreclosure
to borrowers.

12. As a participating server in HAMP, the Defendants have entered into written
agreements for modifications. The Plaintiff, for her part, several times or more has
applied for modification over the years. The defendants have ignored their contractual
obligations to modify the loan permanently or at least temporarily modify.

(8)

13. As a result, the Plaintiff- was deprived of the opportunity to keep her homesand cure

any delinquencies. The actions of the Defendants thwart the purposes of the HAMP

program and are illegal under Massachusetts law.

14. Under Massachusetts Uniform Commercial Code section 2-301, unless the claim can

produce the original note, properly assigned, he (or the claimant) has no collection rights

and cannot foreclose. As of this date Shellpoint and no other company has not produced

the document.    Also the Plaintiff claims improper origination of said mortgage. In

addition the original broker and lied and did bait and switch with the Plaintiff at the point

of origination. The broker misstated the interest rate changes, the points, closing

costs and other key terms. In fact the broker changed the terms at the last minute.

  In essence the broker, gave the Plaintiff amortgage he knew or had reason to know that

he (Plaintiff) could not afford, especially

considering improper escrowing. The Plaintiff was led to believe that she was supposed

to make said payments. Despite years of making the payments the mortgage company

did not recognize her payments and escrowed anyways.

Plaintiff was misled at every stage of the process, through slick marketing

techniques and fast procedures that really did not afford her the opportunity to question.

15. The foreclosure crisis in this state and nation is far from over. Massachusetts state

legislative efforts were able to slow the rate. But, the number of new filings for

foreclosure have once again rose. This year, 2017, the foreclosure rate is still high. This is

primarily due to mortgage companies wanting to clear away back mortgages.

16. Congress had passed the Emergency Economic Stabilization Act of 2008 and then

(9)

Amended it with the American Recovery and Reinvestment Act of 2009("Act").

17. The purpose of this Act was to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership" 12 U.S.C.A. sect 5201.

18. In exercising its authority to administer TARP, the Act mandated that the Secretary of the Treasury "shall" take into account "the need to help families keep their homes and stabilize communities". 12 U.S.C. sect 5213(3).

19. The Act, just as importantly, imposed mandates to implement plans to maximize assistance to homeowners to minimize foreclosures. 12 U.S.C.A. sect 5220

20. Pursuant to this authority, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable Program. The purposes of this program are: (1) The creation of refinancing products for individuals with minimal or negative equity in their home, called the HARP program. (2) To crea.e and implement of a uniform loan modification protocol or HAMP. This was the program that the Plaintiff was invited to take part in and is at issue here. It was funded by TARP funds and other funds. Under HAMP the federal government gave financial incentives to servicers to make adjustments in mortgage obligations in order to give the mortgagor a fresh start and have payments more affordable.

21. The HAMP modification process consisted of two stages, as was done in this case:

(1) The servicer was required to gather together all the required financial information; The Plaintiff fulfilled all of the documentation and payment requirements.

(10)

for many years under the program and-(2) Within established guidelines determine the

feasibility of modifying said mortgage.

22. The Plaintiff could not afford the original loan as it was higher interest and included

an improper escrow account

23. An elaborate scheme web was set up to catch the Plaintiff

She was virtually guaranteed that he could refinance within a few years. This, in spite of

the obvious fact that they could not guarantee that the value of the property would

increase enough to justify it.

24. The Defendants by providing high-cost loan without a reasonable belief in the ability

to repay the points and fees of this loan should have been amortized over the

actual short term to correctly calculate the annual percentage. This is violation of

Massachusetts General 93A, sect 2.

25. These were was part of a scheme to secure high financial return for the Defendant at

the expense of the plaintiff. The Defendant did not care about the Plaintiff's financial

well-being at all . The Plaintiff was shown contempt by the Defendants, when at

every stage of the process she was over charged, denied escrow verification and talked

into taking a bad mortgage; and, then having the terms unilaterally changed at the

Registry to say the least-, all because the broker saw dollar signs

in providing the Plaintiff with this problematic mortgage. This effectively

sent the Plaintiff into a several years campaign to attempt to secure stability in a very

unst ible series of circumstances. The Plaintiff even had to file

Bankruptcy (see affidavit). Clearly, this was not contemplated when she took out the

(11)

mortgage.

Instead, she was misled into thinking she was getting something that she was

not getting.

26. The Plaintiff was told that she could modify or refinance the loan

to help her modify or refinance her mortgage over the next few years. After considerable

effort on the plaintiff's part and numerous applications under HAMP the Plaintiff was

was never modified. Applications were lost. Applications were improperly verified.

After the HAMP program ended the Plaintiff suffered the same treatment. She was

Bounced around over and over again.

27. This on top of everything else negates the ability of the Plaintiff to cure her problems

The client has had a series of problems with mortgagees, none of which has been

Resolved. To this day, the improper escrowing of the taxes and insurance has set the

Plaintiff so far back that she has never been able or allowed to catch up.

28. After HAMP was discontinued at the end of 2016, the Plaintiff continued her efforts

at modification. Unfortunately Shellpoint went into foreclosure mode and started the

process in February 2017. They did not effectively respond to the man y requests on the

part of the Plaintiff to modify or otherwise resolve mortgage difficulties

29. Since this mortgage was based upon initial problems and misleading issues, it

becomes a 'certain mortgage loan" requiring special treatment. The only way

under M.G.L Ch 244 Sect 35B that a

"good faith effort to avoid foreclosure" can be made is to (1) Determine the homeowner's

ability to make affordable monthly payments (2) Identify a modification that achieves

(12)

borrowers affordable monthly payment. (3) Conduct an analysis comparing the net

present value of the modified mortgage and the anticipated recovery that would

result from foreclosure.  Terms cannot be extended more than 15 years more or for

mor: than a total of 45 years.  Clearly, as was required by law, none of this was done by

Feb uary 22, 2017 when the affidavit was filed.  Howe could said affidavit be accurate?

COUNT ONE

VIOLATION OF MASSACHUSETTS CONTRACT LAW AND
MORTGAGE LAW AND FIDUCIARY DUTY. MASSACHUSETTSS
GENERAL LAW CHAPTER 183 SECTION 28C LOAN NOT IN THE
BORROWER'S INTEREST.

30. By Unilaterally changing the terms of the mortgage and forcing the Plaintiff to

pay into an escrow account after Plaintiff clearly and properly had been paying both the

insurance premiums and property taxes, Defendants breached their agreement with the

Plaintiff and created a mortgage with ever increasing monthly payments, that in the long-

run effectively negated the ability of the Plaintiff to pay off and function under said

mortgage.

31. Chapter 183 Sect 28 C States:

(a) A lender shall not knowingly make a home loan if the home loan pays off all or part of an

(b) existing home loan that was consummated within the prior 60 months or other debt of

(c) the borrower, unless the refinancing is in the borrower's interest. The "borrower's

(d) interest" standard shall be narrowly construed, and the burden is upon the lender to

(e) determine and to demonstrate that the refinancing is in the borrower's interest.

(f) Factors to be considered in determining if the refinancing is in the borrower's interest
include but are not limited to:—

   (1) the borrower's new monthly payment is lower than the total of all monthly obligations
      being financed, taking into account the costs and fees;

(2) there is a change in the amortization period of the new loan;

(13)

(3) the borrower receives cash in excess of the costs and fees of refinancing;

(4) the borrower's note rate of interest is reduced;

(5) there is a change from an adjustable to a fixed rate loan, taking into account costs and fees; or

(6) the refinancing is necessary to respond to a bona fide personal need or an order of a court of competent jurisdiction.

(b) Notwithstanding any provision to the contrary contained in this chapter regarding costs and attorneys' fees, in any action instituted by a borrower who alleges that the defendant violated subsection (a), the borrower shall not be entitled to costs and attorneys' fees if the presiding judge, in the judge's discretion, finds that, before the institution of the action by the borrower, the lender made a reasonable offer to cure and that offer was rejected by the borrower.

(c) The commissioner of banks may prescribe from time to time such rules and regulations as r.lay be necessary or proper in carrying out this section. Such rules and regulations may contain such factors, classifications, differentiations or other provisions, and may provide for such adjustments and exceptions for any class of transactions as, in the judgment of the commissioner, are necessary or proper to carry out this section, to prevent circumvention or evasion thereof or to facilitate compliance therewith.

32. No cash was made available to the Plaintiff. Once the original terms were agreed to the Defendant merely and unilaterally changed the terms and then offered the new and higher interest rate mortgage to the Plaintiff on a take it or leave it basis when they met to close at the registry off deeds after the mortgage was already finalized before. This was a clear bait-and-switch. The interest rate was not lowered. The principal was increased.

33. The Defendants breached their agreement by refusing to recognize the correct and contractual payment of taxes and insurance premiums by the Plaintiff and by in effect double charging by escrowing for the payments. This went on for a few years until the Plaintiff gave up trying to get the mortgage company to back off and stop escrowing for the amounts. By doing this the Defendants created a mortgage that was increasing in

(14)

premiums and payoff all of the time. It made it harder and harder for the Plaintiff to keep

up with the changes. In a very real way the mortgage acted like an adjustable rate

mortgage due to the aforementioned issues.

34. As the mortgage became more and more unaffordable, the mortgage companies did

little to correct the wrongdoings or modify to give her a more favorable mortgage. In fact

NO good faith offer was ever made to correct the mortgage issues by their breach and

neglect of their fiduciary duties. Now they rush to foreclose.

COUNT TWO

BREACH OF CONTRACT UNDER HAMP (program expired 12/30/16). LACK
OF GOOD FAITH ON THE PART OF DEFENDANTS TO RESOLVE
MORTGAGE DIFFICULTIES

35. For several years under the now discontinued HAMP program the Plaintiff attempted

many applications for modification under the HAMP program. Since the end of the

program on 12/30/16 the Plaintiff has tried just as hard to modify, as most mortgage

companies including the Defendants have in house programs. However, just like before

the Defendant has ignored the efforts of the Plaintiff and her applications. This is the

case in spite of the fact that the Plaintiff never ceased to follow up and request status

updates of her applications and always provided all information. What she never got was

any help or assistance. Virtually none of the efforts of the Plaintiff was successful in

getting so much as a response from the Defendants. In the case of this Plaintiff, "inertia"

was the only option.

36. Even though this is a former federal program, the Plaintiff has standing to vindicate

her rights under state contract law as here.

(15)

37. To establish a breach of contract, Plaintiff must allege that there is a valid contract, that the Defendant breached its duties under its contractual duties, and, that the breach caused the Plaintiff damages.  Guckenberger v. Boston University, 957 F. supp. 306, The elements of a valid contract are offer, acceptance, and an exchange of consideration or a meeting of the minds.  See Vadnais v. NSK Steering Systems, Inc., 675 F. Supp. 2$^d$ 205,  207 (D. Mass. 2009).  This is clearly the case here.  At every stage until the very end, the Plaintiff was TOLD that she qualified for a modification.

38.  There is consideration here.  Consideration is a "bargained for exchange where there is legal detriment of the promise or corresponding benefit for the promissory" Durmic, 2010 WL 4825632, at *3.  This detriment goes beyond mere monthly payments. This Plaintiff was required to provide documentation of current income, make legal representations about personal circumstances and undergo credit counseling.  These are all are legal detriments that flowed from acceptance.  Wit v. Commercial Hotel Co., 253 Mass. 564, 572 (1925)

39.  Plaintiff has suffered severe damages.

 She was forced to file for modification approximately 6 times and lose and waste more  than five years of her life.  And, this was the case for his only to be told that. forms were lost on dozens occasions, not received  or that she was not under consideration. She was forced to file for bankruptcy to save her property.

40. By reneging on it stated commitment and assurances; and, by failing in the final analysis to follow through on its commitments, the Defendants have breached their agre ement with the federal government and the Plaintiff and both directly and as a

(16)

third party beneficiary of the federal agreement are entitled to sue for breach of contract

and fraud and to stop any foreclosure.

41.  Plaintiff stands ready, willing and able to CONTINUE to perform under the

any agreement that is reasonable and correct the problems in the mortgage.

42.  The Plaintiff has suffered real harm by the Defendant's breach.   She has struggled

for years to keep the home. She is much worse off than before she tries to resolve her

mortgage difficulties.

43. Parker v. Bank of America, Middlesex Superior Court Civil Action number 11-1838

 (2008). The Court determined that when a homeowner complies with the terms of the

Making home Affordable Program and submits the documents as required, the mortgage

Company is required to give a timely basis feedback and information needed to complete

an application for modification.  "Inertia is not an option". If the mortgage company

loses documents, mishandles documents or does not handle documents properly, that

company can be sued for breach of third-party intended beneficiary contract.   In this

case the violation was so gross as to constitute substantial breach of contract.

This breach continued long after the program ended.  The Plaintiff now faces foreclosure

loss of her property


## COUNT THREE

### Breach of Implied Covenant of Good Faith and Fair Dealing

44. Plaintiff repeats and re-alleges every allegation above as if set forth herein in

full.

45. Defendant is obligated by contract and common law to act in good faith and to deal

(17)

fairly with each borrower.

46. The purpose of the covenant is to guarantee that the parties remain faithful to the

intended and agreed expectations of the parties in their performance Uno Restaurants,

Inc. v. Boston Kenmore Realty Corp. 441 Mass. 376 (2004).

47. Defendant has routinely and regularly breached its duty of good faith and fair dealing

By:

    a. Failing to perform loan servicing functions consistent with its responsibilities

to plaintiff.

    b. Failing to properly supervise its agents and employees including, without

limitation, its loss mitigation and collection personnel and attorneys;

    c. Routinely demanding information already in its files.

    d. Making inaccurate calculations and determinations of Plaintiff's

eligibility for modification.

    e. Intentionally and negligently failing to follow through on any segment of the

process to Plaintiff.

    f. Failing to follow through on written and implied promises

    g. Failing to follow through on contractual obligations and

    h. Failing to give permanent HAMP modifications and other foreclosure

alternative to qualified Plaintiffs.

48. As a result Plaintiff has suffered significant damages and will lose

his home within days.

49. "Every contract implies good faith and fair dealing between the parties to it. The

(18)

covenant of good faith and fair dealing requires that neither party shall do anything that
will have the affect of destroying the or injuring the right of the other party to the fruits
of its contract." T.W. Nickerson Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 569-570. (2010)
the Defendant clearly acted with dishonest purpose or conscious wrongdoing necessary
for a finding of bad faith and unfair dealing. If there ever was a case where this rule
applies, surely, it is this one. Also, as in Speakman v. Allmerica Life Ins. 367 F. Supp.
2d 122, 132 (D. Mass. 2005), "(The court in looking at this rule, must consider whether
"the challenged conduct conformed to the reasonable understanding of performance
obligation as reflected in the overall spirit of the bargain." To say the least by
dishonestly reneging on the contractual obligations in this case, the Defendants
clearly did not act reasonably at all.

50. Since the end of the program the Defendants continue violate the good faith and other
doctrines with their continued neglect and mistreatment of the Plaintiff. Once again her
efforts and application are ignored and treated negligently.

## II.  Violation of Duty of High Good Faith and Trusteeship

50. The sale of the residence, if allowed, would be a violation of the duty of the
mortgagee to act in strictest good faith and trusteeship. Defendants failed to
respond to the numerous attempts by the Plaintiffs to resolve mortgage issues and
delinquencies and failed to respond to the Plaintiff's requests and acted in bad
faith by proceeding forward toward foreclosure and other actions, leaving Plaintiff to his
detriment. Defendants failed to act even in basic good faith and use
reasonable diligence to protect the interests of the Plaintiff. After literally dozens

(19)

attempts to work with many "representatives" of several mortgage companies,

Plaintiff was in much worse shape than before he tried.

IIII. Failure of Defendants to Act in Good Faith and Use

Reasonable Diligence to protect the interests of the Plaintiff

51. In Robert H. Strayton v. Champion mortgage, et al, United States Bankruptcy Court,

District of Massachusetts, Adversary Proceeding #06-01394. (2006),

Judge Somma outlines the criteria to determine whether or not the mortgage company

practices good faith and uses reasonable diligence to protect the rights of the

mortgagor while proceeding forward with an auction. "It is well-established that under

Massachusetts law a foreclosing mortgagee must do more than comply with

the procedures prescribed by statute...The foreclosing mortgagee must also act in good

faith and use reasonable in conducting the foreclosure sale.: (See

Memorandum  and Order of Judge Robert Somma, Strayton, at page 4) "More

importantly, the diligence not done  is persuasive...: no marketing, no appraisal, no

real estate broker contact, no inquiry into the market regarding either value or

prospective buyers, no inspection effort. Moreover if the foreclosure sale is

completed significant value will be lost to the (bankruptcy) estate."(see Memorandum

and Order of Judge Robert Somma, Strayton, at page 4.)

These words also apply to this case.  As stated in other parts of this complaint, none of

the above was done here as well.  Nevertheless, the foreclosure process has

begun.

52. ˙ here is the added factor here that the mortgage company through trustee will try to

repurchase the property auction.  According to Snowden v. Chase

(20)

Manhatten Mortgage Corporation et al., (17 Mass. L. Reporter 27; 2003 Mass. Super.

LEXIS 398), when the mortgage company also attempts to repurchase the

property at auction; "it will be held to the strictest good faith and utmost diligence for the

protection of thr rights of the principal." (Snowden, 17 Mass. L. Reporter

27 (2003) at 29). Since Defendants always try to repurchase said property at auction, it

owed the Plaintiffs more than just the minimal statutory requirements for

compliance, the Defendants owes the Plaintiffs the strictest good faith and trusteeship by

modifying the terms of the oppressive mortgage, based upon

misrepresentations, and any other effort that would have protected the equity. At the very

least, the facts indicate that the auction should be prevented from

occurring. In virtually all cases, the foreclosing Trust, on behalf of the mortgagee,

attempts to repurchase at auction.

53. The Massachusetts Attorney General's Office has investigated many nation-wide

mor gage servicers for their practices. In spite of these numerous efforts and

recommendations by the Massachusetts Attorney General's Office, The leading

mortgagees and others routinely fails to give customers information on

the amount and purpose of the discount points and fees imposed on the loans.

Representatives of the mortgage companies at the point of origination made false

statements regarding loan terms and charges, material costs of the proposed loans,

whether the loan included escrow payments and insurance payments and the

insurance payments, the willingness of the mortgage company to refinance at a later date,

misleading statements regarding prepayment penalties. Plaintiff did not get

(21)

any sheet before the closing listing what the expenses would be at closing. Stated income
was the basis of both mortgages, a clear violation of state law.

54. Representatives ignored written disclosures required to be made by the Consumer

Credit Cost Disclosure Act, the Truth in Lending Act G.L., 184, chapter

17D and the real estate Settlement Procedures Act, including, but not limited to the Good

Faith Estimate of Closing Costs. Defendants either misrepresented costs

or disparaged the accuracy. The Yield Spread Premium paid by the various mortgage

companies to its agents encouraged agents to charge borrowers above the

wholesale par rate what the borrower qualifies for. Financial incentives such as this

allowed brokers to charge homeowners higher than they could afford.

Defendants by information and belief have utilized these incentives in the past and

probably at the time of origination of this loan. None of this was explained to the

Plaintiff. The plaintiff was directed to take loans that were not in his best interests. .

55. There were virtually no standards regulating the broker's behavior.

. None of the deceptive outlined were scrutinized or corrected. When the Plaintiff
attempted to ask questions he was given a 7 year run around.

56. This combination of fraudulent origination issues and procurement of loan behavior,
combined with insincere efforts to straighten out the problems

later and of course with the mortgage company's lack of marketing of the property, cause
the Plaintiff to lose his property and residence. They indeed may

have been targeted as easy marks as it claimed in many of the Massachusetts Attorney
General's office.

(22)

57. The mortgage is presently in arrears and is about to be foreclosed on.

Shellpoint lacks the standing to foreclose and should not be allowed to

to do so.

58. The various actions and inactions and nondisclosures outlined above violate the:

(I.) The federal Truth in Lending Act 15 U.S.C. 1601, et seq., and the

Massachusetts counterpart, The Consumer Credit Disclosure Act, c. 140D. These

stat  tes require, among other things,  that the lender provide the borrower about the

actu al costs of the loan in a timely fashion.  This did not happen here.

(II)  The federal Real Estate Settlement Procedures. 12 U.S.C. 2601, et seq., and

the Massachusetts counterpart. G.L. 184 17D (c) (1).  These statutes

require, among other things, that a lender provide advance disclosure about costs of a

mortgage loan so that the borrower may compare  available rates and terms

from one lender to another to get the most favorable terms.

(III)  M.G.L. c. 183  63, which requires that the lender make clear to the borrower

the points it charges to a borrower.  This did not happen here.

(IV) In addition, Defendants have been in violation of Chapter 268 of the acts of

2004 under MGL Ch. 183 Section 28C, the Act Prohibiting Certain

practices within the Mortgage Home Lending Market, by selling a mortgage that was

clearly not in the Plaintiffs best interests.

(V)  The Attorney General of Massachusetts has just completed an upgrade of rules

and regulations concerning mortgage lending practices in

Massachusetts.  The Attorney General now insists that all of these origination violations

(23)

should all along have necessitated voiding these mortgages due to the fraud.
See 940 CMR 8.0. The United States Congress has proposed legislation in, House Bill
No. 3913, outlawing Yield Spread Premiums (YSP)

(VI) In the case of Snowden V. Chase Manhatten Mortgage Corporation, et al, (17
Mass. L. Rep. 27; 2003 Mass., Super Lexis 398) the Massachusetts
Superior Court went even a little further that requiring normal good faith and reasonable
diligence when the mortgage company conducting auction also attempts to
purchase the property at same auction. This is virtually always the case. When these set
of facts occur, the Court quoted a series of prior decisions in concluding
that the mortgage company becomes a trustee held to the highest standards of good faith
and utmost diligence for the protection of the mortgagor/homeowner. One
of those strict standards is clearly protecting the equity or property of the homeowner.
Not'ing was done to market the property or very little to assist the Plaintiffs to modify
the oppressive terms or complete a successful forbearance, Defendants clearly fell far
below these standards. If there ever was a case of individuals being targeted
and tricked and being hung out to dry, this was it.

59. Based upon a series of class action lawsuits filed by Attorney General of
Massachusetts, some referred to above, a new theory of the relationship between
mortgage companies and their "prey" in this state. It is clear from the fact patterns here
and elsewhere that "unfair and defective mortgage "were hoisted upon an
unwary homeowners. As the marketer of these defective products. And others should be
required to pay the price for their adverse efforts.

(24)

However, due to same the same misleading policies being followed in the origination and

servicing of the mortgage and other improper and illegal tactics by this company, this

present case is even more likely to justify a preliminary injunction.

60. Article 3 of the Uniform Commercial Code Sect 3-301 indicates that clearly

Nationatsr and its assigns lack standing to do anything here. The cannot produce the

original not properly assigned note and cannot claim the status if agent for the note

holder.

61. The Plaintiff was clearly a third-party beneficiaries of federal HAMP contract

between the abovementioned mortgage companies and the federal government. To

enforce the contract the Plaintiffs must be and clearly are, "intended beneficiaries" In

this the performance required of the servicers who entered into the HAMP (SPA)

agreement was intended for the direct benefit of borrowers struggling to pay first

mortgages on their residences, with the hope of additional but incidental benefits

accruing to the economy as a whole. Denying of the third-party beneficiary status to

aggrieved by violations of HAMP would mock the very goals of the program that the

contract was intended to further. In the Plaintiff's affidavit there is alleged a lengthy

period of lost and re-submitted paperwork. The mortgage company, after stating that

they were "qualified for HAMP". However, no verification was given. Instead, the

Plaintiffs were told time after time that paperwork was incomplete or that deadlines

were passed. The Plaintiff applied at least 6 times. She responded quickly to

every request for re-submission of information or additional information. In every case,

she was told that the information had not been received or that deadlines were passed.

While this was going on collections calls continues, letters were sent and the mortgage company moved closer and closer to foreclosure.

Inertia is not an option. The servicers are given specific time limits to respond. Dec isions must be made on a quick and definite basis. Regulations are clear. Specific duties and responsibilities are owed the homeowners by the mortgage companies. The plaintiffs were not treated fairly. Based upon this reasoning, the plaintiffs lay a claim of contract fraud. In this matter plaintiffs relied on statements and claims made by the Defendants that were wrong or that the Defendants had reason to believe were wrong. The plaintiffs relied on these statements to their detriment. And, Breach of Contract: (1) The Defendants by failing to comply with the federal HAMP guidelines breached their contracts with the Plaintiffs for mortgage servicing/and/ or lending, and (b) the Plaintiffs, as demonstrated before, are third-party beneficiaries of the defendant's contract with the federal government under the HAMP program, which contract the Defendants have clearly breached. See Parker v. Bank of America, Civil Action No. 11-2838, Middlesex Superior Court.

Since the end of HAMP on December 30, 2016

## COUNT THREE

Violation of Massachusetts General Laws c. 106 sect 3-301. A

62. Massachusetts General Laws c.106 sect. 3-301 clearly states that in order to enforce a the "person" or entity must be in possession of the note. There are only certain limited exceptions to this..

Neither one can produce the note. Neither one had standing in the matter.

(26)

63. Furthermore; one must be a holder in due course in order to have the right to collect the debt (here a mortgage) Massachusetts General Law Chapter 106 sect 3-302. Physical possession of the note is required for a party to be a holder in due course. M.G.L. sc. 106 sect 1-201(20). Since the mortgage is the document that attaches the debt evidenced by the note to the property. Therefore both the mortgage and note must be attached at all times.

64. A mortgage is security for a note or other obligation. Private Lending and Purchasing, Inc., v. First American Title Insurance Co., 54 Mass App Ct, 532 at 537. (19﹖5). The mortgage (is) but incident to the debt. Perry v. Oliver 317 Mass. 538 (1945).

65. Therefore, in order for a mortgage to have effect in Massachusetts, the STATED holder of the mortgage must also have the note. M.G.L. c. 106 sect. 1-201 (20), the holder must be in possession of the note.

Bartholick 35 N.Y. 44. (1867). A leading treatise on the matter by Howard Alperin, 14 C Massachusetts Practice: Summary of Basic Law, 15.126 (4th Ed. And supp. 2009-2010). Summarizes it as follows: Both the obligation and the security interest must be transferred to the same person. A transfer of the mortgage without the debt is a nullity, and,no interest is acquired by it. The security cannot be separated from the debt and exist independently from it. Of the identity of their lenders. Schwartz at 266.


COUNT FIVE

VIOLATIONS OF G.L. CHAPTER 244 SECTION 35 A, B AND C

(27)

66. During all of the years involved until the filing of the required affidavit, as shown by supporting documents, the Defendants lost, misplaced documents sent by the Plaintiff. The plaintiff made MANY applications for modification. Also, in most cases, the Defendants did not provide the Plaintiff with any of its calculations. Under Chapter 244 Section A, B and C, the Defendants were required to determine the borrowers (Plaintiff's) current ability to make an affordable monthly payment. Secondly, the lender Is required to identify a mortgage, loan that achieves the borrowers affordable monthly Payment: reduction in principle, reduction in interest rate, or an increase in amortization period. Finally the statute requires that the mortgage company conducts a comparative analysis comparing the new present value of the modified mortgage and the anticipated net recovery that would result from the foreclosure: Which would give the greater return to the investors. The results must be made available to the mortgagor (the plaintiff etc.).

67. The mortgage company is required to follow these and other related guidelines to see what the homeowner can and cannot afford. The Net Present Value (NPV) is a complicated series of calculations that must be done and there must be transparency. The calculations must be made available and given to the homeowner (Plaintiff). They were not given to the Plaintiff.

As the records attached shows the Plaintiff was not effectively assisted in the modification efforts. For years application were lost or mislaid. Information already supplied was asked for over and over again.

68. The statements in the affidavits are incorrect, at best and false at worst.

(28)

## PRAYER FOR RELIEF

WHEREFORE, The Plaintiff respectfully requests the following relief:

A Enjoin any other entity from foreclosing on the property at 21 Dewey Avenue, #2, Provincetown, MA.

B. requiring that ANY entity be required to produce the original note properly assigned to establish their collection and/or foreclosure rights under the mortgage. As a substitute an affidavit probing that they are operating as the agent of such an entity is required.

C. Enter a judgment declaring that the acts and practices of the Defendants complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required in good faith to assist the Plaintiff in resolving her mortgage difficulties

D. Order the Defendants not to interfere with the use, occupancy and enjoyment of the property at 21 Dewey Avenue, #2, Provincetown, MA

E. Order all the Defendants to return all mortgage monies improperly paid by the Plaintiff to the mortgagees.

E. Grant a permanent and final injunction enjoining the Defendants and agents employees, affiliates and subsidiaries from continuing to harm Plaintiff.

F. Crder specific performance of Defendant's contractual obligations together with other relief required by law and contract and law.

G. Award actual and punitive damages to the plaintiff

H. Award the Plaintiff the costs of this action, including the fees and costs of

(28)

any experts called, together with reasonable attorney's fees.  Also, repay Plaintiff

all monies paid to Defendant.

    I. Grant Plaintiff such and other and further relief as this Court finds necessary

and proper.

DATE: July 5, 2017

                         Respectfully submitted
                         On behalf of the Plaintiff
                         Heather Davis

                         Robert K. Cabana BBO 641885
                         1354 Hancock St., Suite 206
                         Quincy, MA 02169
                         Tel no. 617-405-4283
                         Rkc6068@aol.com

## AFFIDAVIT OF JEWEL JONES

I, Jewel Jones, Take Oath and Swear the following:

In 1995 I was hired by a resort in Provincetown to sell their vacation condos. In March of 1995 I came up from Florida where I was working in real estate and living to get my Massachusetts real estate license and to secure housing for the summer. I specifically looked for a cottage by the beach to rent and one that possibly was for sale also. Ms. LaBranche took me around to look at property for rent. When we came to, 21 Dewey # 2, I knew that it was what I had dreamed off and took it. We also rented the cottage for '96. In 1998 Heather Davis and I purchased the cottage from owner James Shipalowski who owner financed for us.

A few years later I was receiving solicitations in the mail for a loan from Greenpoint. Heather and I discussed that paying off Mr. Shipalowski would be a good decision and we may have added paying off some bills. I took out a mortgage with Greenpoint.

In the mail I continued to receive solicitations for a loan from Greenpoint to refinance and pay off any other debts I had. I trusted Greenpoint because the loan officer and I had a history with Gordon College, a 4 year Christian Liberal Arts College in New England and felt his ethics could be trusted. This time around we felt that Heather should take out the loan and should just be in Heather's name and on her credit.

In 2005 Heather applied to Greenpoint for a loan of $155,000 to consolidate the remainder of the $46,000 loan Jewel had, and pay off other bills. On 2/15/05 Heather paid a $600 lock in loan deposit for the terms of $155,000 a fixed rate of 5.87% for a 30 year term. In March, they set new terms, $155,000 and a fixed rate of 6.25%, 30 year loan.

On 4/12/05 the closing for the loan was at the Barnstable Registry of Deeds and met Jacqueline Millar Esq of Bonaccorso and Associates of Boston.  When we sat down w/ the attorney Heather was told the loan was $9,000 less than she expected which would not cover the credit card debt that we wanted to pay off along with the mortgages we were paying off and consolidating.

Then to my surprise and anger Ms. Millar put a Quitclaim Deed on the table for me to sign away my interest and rights to the property because only Heather was on the note. I was indignant on not signing away my rights to the cottage and asked both of them what the hell was going on? Heather stated this was not the case, that neither I nor Heather ever wanted me to sign away my interest in the property we had purchased together. I would not sign the quit claim deed and Ms. Millar stated that we would not close. I said fine and got up to walk out. She said wait and went to make a phone call. She returned to our table pulled a document out of her briefcase and said that I needed my signature to acknowledge that Heather was taking the loan out and that I was not on the mortgage. I then signed the document. Ms. Millar said she would send us copies which I believed we did not receive.

Everything seemed to be going well with our payments until Heather started to receive a notice that Country Wide was taking over the loan. Heather would receive bills for extra amounts than what was stated in the original loan. Taxes, insurance and etc. Then it went to Bank of America with similar extra charges.

We then had to declare bankruptcy. Between not being able to keep up with credit card payments (The ones we were going to pay off from the original loan but could not because of the change of amount borrowed.) and Real

Estate financial crisis I declared Bankruptcy and then a few years later Heather did also.

We had a rough few years financially. Heather said she could not keep up with the yoyo amounts they were asking along with paying double insurance and taxes they were throwing at her. After not paying two months they posted notices on our door in January and February for foreclosure and another for abandonment of the property because the cottage was closed down for the season. We had contacted them several times before to help with our payments and we also let them know that the property was not vacated or abandoned as it was just shut down for the winter.

Several times Heather tried to apply for a home modification usually with no answer or indicating she need to fill out another application or send some other paperwork. Felt like we were chasing our tails in a circle. I then contacted Attorney Vicki Mitchell to help us with the home modification and to deal with the bank or collection agency that is Shellpoint. Again, Vicki helped us and sent several home modifications to Shellpoint usually with no answer. She might have reached them once or twice. I even tried with being a co borrower in the Shellpoint application process and to show both our incomes and the rental income we receive from the cottage in the summer.

Ironically Shellpoint started to add my name to the collections and mail. Never was a mortgage bill ever sent to me by Greenpoint in 2005 and then bills subsequently from Countrywide, Bank of America or NY Bank of Mellon were never addressed or billed to me.

In December of 2016 we received an attorney's letter from the law office of Harmon in Boston concerning the Soldiers and Sailors Relief Act Notice. Attorney Vicki Mitchell wrote Harmon and associates in response to their letter and reminded that I was not the mortgage holder. From that point on I was never addressed again with billing or correspondence. I even called the numbers to follow up on the latest Shellpoint home modification loan application to see if they needed anything else and they stated they could not speak with me because I was not on the loan. Groan!

On February 2, 2017 to my shock and dismay the MERS Soldiers and Sailors notice of intent to foreclose was in the Provincetown Banner Newspaper, with both my name and Heather's name, even though I am not even on the note. The Barnstable Sherriff also left a copy in the door of the MERS Soldiers and Sailors notice of intent to foreclose.

The above is much grievous to my career as I am a Realtor. I have mostly done vacation rentals in the last 30 plus years. In 2016 I launched into real estate sales with a few sales under my belt. I can assure you this has not helped my career nor my emotional and mental health. All during this latest round with Shellpoint applications and notices from December 2016 thru February 2017 I was helping my sister who died from Pancreatic Cancer on March 8, 2017. The shame and embarrassment I feel and the cost and the results financially, due to the damage of reputation. I am a sales consultant extraordinaire and I have the awards and letters from customers to prove it.

This June while I was at the property a man showed up and was walking around the cottage. I was concerned and frightened. My neighbor was on her porch and was there also. I asked the man if I could help him? He said no concern of yours. I think he thought I was a tenant or the maid. I said while yes it is. He said Oh and then handed me his card. He is an appraiser for the bank.

The emotional and mental toll this has had on me has been severe! I am on anxiety medicine and have to take a sleeping aide to sleep. I have spoken with my therapist and spiritual council on the above matter many of times.

Clearly these are predatory lenders and fraudulent practices. The anger and grief I feel has set me back tremendously and fear it has ruined my life and reputation.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS TWENTY-SEVENTH DAY OF JUNE IN THE YEAR 2017.

Jewel Jones

....

### AFFIDAVIT OF HEATHER DAVIS

I, Heather Davis, Take Oath and Swear the Following:

In 1995, Jewel Jones and I rented 21 Dewey Ave. #2 Provincetown MA as a summer rental for

the season, from owner James Shipalowski. It worked out well, and we returned the summer of 1996. In 1997 the cottage was listed for sale, and in April of '98 we purchased the cottage with a good sized down payment and Mr. Shipalowski financed the rest. After a couple of years, we explored a mortgage to pay him off, and Greenpoint Mortgage Funding of Novato, CA gave Jewel a mortgage. Because we had a history with Greenpoint, in early 2005, we applied to Greenpoint for a loan of $155,000 to consolidate the remainder of the $46,000 loan Jewel had, and pay other bills. On 2/15/05, I paid a $600 lock in loan deposit for the terms of $155,000 a fixed rate of 5.87% for a 30 year term. However in March, it somehow became new terms, $155,000 and a fixed rate of 6.25%, 30 year loan. I had NOT agreed to those terms. They were slipped in at the closing.

Imagine my surprise when we arrived at the Barnstable Registry of Deeds on 4/12/05 and met with settlement agent Jacqueline Millar Esq of Bonaccorso and Associates of Boston and was told the loan was for $146,000, fixed rate 6.25%, 30 year loan. It was $9,000 less than I expected, and was told I was approved for. (Loan #0202255121) Ms. Millar put a Quitclaim Deed on the table for Jewel Jones to sign, and was under the impression that Jewel would sign away her interest in the property since I was the only one on the note.

This was not the case, neither Jewel nor I ever wanted her to sign away her interest in the property we had purchased together. Jewel did not sign that document and Ms. Millar indicated that we wouldn't be able to close. She left the table to make a phone call she said, and then returned to the table. She pulled a document out of her briefcase that she said Jewel needed to sign to indicate that she was officially aware I was taking the loan out. Jewel signed that document. However, it was clear I was the borrower, and that I was one who signed the note for the loan, which said it was a fixed rate, and payment would be $898.95 per month, for 30 years. At the end of the closing, I requested Ms. Millar send me copies of everything, and she said she'd send them. Weeks went by, no copies arrived. The phone number I had for her would just ring and ring, no way to even leave a message.

This had been a standard mortgage loan. As long as I paid the taxes and insurance, there would not be escrowing of amounts to pay them, which would be duplication.

A couple of months later, Greenpoint notified me that Countrywide Lending would now be servicing the loan. The payments were $898.95 for a couple of billing cycles, and then things changed. Bills started to show escrow amounts added to the payment, though property taxes and insurances we paid by me already.  Phone calls to Countrywide Lending seeking clarification were of no help. Being put on hold, switched from one person to another, to another and yet another employee resulted in no clarification whatsoever.

I asked representatives what they thought my payment would be the following month, and they had no idea. A couple of times escrow amounts of appx. $23.00 were credited back to my account, and the billing statement would show additional amounts so it became very confusing. Also noted were the Life Insurance promotion brochures included in my billing statements, and before too long Hazard Insurance amounts were part of the additional amounts tacked onto the original $898.95 though Countrywide Lending was provided with the Hazard Insurance policy information already covering the property.

Balboa Insurance which was a subsidiary of Countrywide Lending randomly decided to place a Flood Insurance Policy on the property, though I already had a Flood Insurance policy I paid for myself with a local insurance provider. Balboa's rates were very high, by the way, for the same coverage I already had. Thus statements were sent to me asking for $1017.14, or $952.02, or $999.03 or $1260.65. One never knew what the amount would be, but usually it was substantially more than the $898.95 I agreed to pay monthly for the 30 year fixed rate mortgage.

Indeed, from 2005 through 2008, I paid nearly $7,000 in property tax payments. And, I also paid during that period $11,656 in property insurance payments. In spite of this, the taxes and insurance were escrowed. It was very discouraging, as I tried time and time again to stop the extra and unnecessary charges. I got no cooperation from the mortgage companies.

Countrywide Lending sold the loan to Bank of America, and the same pattern continued.

For example May '11 the amount was $1254.40, June was $1254.40, July was $1263.68. That amount was appx 39% more than the original $898.95. From June of 2005 until November 2011 I was prompt with my payments, despite never knowing from one month to another what the billing statement would be. During the financial crisis of '08 and '09 my credit card interest rates escalated, my income began to decline in '10, and in November of 2011 I found myself in the unfortunate position of not being able to pay.

Conversing with representatives about what to do, what help there could be less than two months after my default, yielded a Notice of Intent to Foreclose sent to me in the mail, and Vacancy Notices with information on how to contact Bank of America for the sale of the property were posted physically on my door 1/24/12, and again 2/12/12 and 2/29/12 by Mortgage Contracting Services.

It was clear there was no desire to work with me on finding resolution to my default. Faced with the possibility of Foreclosure, I filed Chapter 7 bankruptcy in the spring of 2012. This was discharged in the summer. Not long afterwards, Bank of America hired Resurgent Mortgage Servicing, of no help at all, and after that they hired Shellpoint Mortgage servicing who make it very clear they are a Debt Collection service.

Because so many people in our country had gone through similar circumstances, Home Modification programs started to emerge as a solution for those seeking to hold onto their homes. With an attorney's assistance, I have submitted Home Modification applications 6 times. Oct. '15, Feb. '16, May '16, (6/10/16 submitted additional docs as requested) Dec. '16, Feb. '17 and most recently May 23, '17. Each time these are submitted, the reply is always the same; some box wasn't checked off, or some item like a W-2 is requested, though I file 1099s so don't even have W-2s. Or they ask repeatedly for filled out forms that were already completed and sent to them. Again, no help whatsoever. Made clear every time I fill out the lengthy applications is my desire to keep my home and come to some kind of resolution. Federal and State Income Tax returns for years were submitted; paycheck stubs, Bank Statements, transcript requests, Dodd Frank forms, leases that reflect rental income in addition to my own paychecks and rental income bank statements to demonstrate my ability to pay a modified monthly amount have not stopped the cogs of the Foreclosure process.

And though the Home Modifications say that during the review periods the process of foreclosure is supposed to wait, it hasn't. Imagine my horror when I saw the MERS Soldiers and Sailors notice of intent to foreclose in a February 2, 2017 edition of the Provincetown Banner Newspaper, with both my name and Jewel's name, though she's not even on the note. I am a Realtor, and have been employed at V.I.P. Real Estate, Inc. since 1997, twenty years. The embarrassment Jewel, who is also in the real estate field, and I feel is terrible, and I'm sure has already cost us financially, due to the damage of reputation.

Recently, while Jewel was at the property a man showed up, and was walking around the property. She didn't know who he was, felt frightened by the surprise visit, and when asked if she could help him he replied gruffly "It's no concern of yours." She told him, "Well, it is, I own this home." "Oh." was his reply, and he handed her a business card, turns out he's an appraiser.

The sleepless nights, constant worry, diligence and time devoted to filling out papers with a great deal of private financial information and sending it to strangers with no answers in return is extremely unfair. The handling of this loan from the start has been deceptive and unfair.

Sincerely,


SIGNED UNDER THE PAINS AND PENALTIES OF EPRJUY THIS TWENTY-EIGTH DAY OF JUNE IN THE YEAR 2017

Heather Davis

Doc:999,198 04-19-2005 11:18
BARNSTABLE LAND COURT REGISTRY

After recording please return to:

GreenPoint Mortgage Funding, Inc.
[Company Name]

[Name of Natural Person]

981 Airway Court, Suite E
[Street Address]

Santa Rosa, CA, 95403-2049
[C. y, State  Zip Code]

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

MIN: 100013802022551214

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)     "Security Instrument" means this document, which is dated April 12, 2005, together with all Riders to this document.

(B)     "Borrower" is Heather Davis  and  Jewel Jones

. Borrower is the mortgagor under this Security Instrument.

(C)     "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D)     "Lender" is GreenPoint Mortgage Funding, Inc..
Lender is a Corporation organized and existing under the laws of the State of New York. Lender's address is 100 Wood Hollow Drive, Novato, CA 94945.

(E)     "Note" means the promissory note signed by Borrower and dated April 12, 2005.
The Note states that Borrower owes Lender  One Hundred Forty Six Thousand  and 00/100ths Dollars (U.S. $146,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1, 2035.

G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

**(F**      **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)**     **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)**     **"Riders"** means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower *[check box as applicable]*:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☒ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Revocable Trust Rider | |
| ☒ Other(s) *[specify]* | EXHIBIT A | |

**(I)**      **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)**     **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)**     **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)**     **"Escrow Items"** means those items that are described in Section 3.

**(M)**     **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)**     **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)**     **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)**      **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.  **Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

—TE : COMPLIANCE SOURCE, INC—
www.compliancesource.com
©2000, The Compliance Source, Inc.
LOUISIANA, 6000 Rev. 01/04

GPMWD0202255121111

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such

repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's

G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security



G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.



G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by



Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtsey and dower in the Property.

———————————————————{Signatures on Following Page}———————————————————

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                       Heather Davis                -Borrower
                                                                    [Printed Name]

                                       _____ (Seal)
_____          Jewel Jones                  -Borrower
                                                                    [Printed Name]

                                       _____ (Seal)
                                                                    -Borrower
                                                                    [Printed Name]

                                       _____ (Seal)
                                                                    -Borrower
                                                                    [Printed Name]

_____ [Space Below This Line For Acknowledgment] _____

State of MASSACHUSETTS          §
                                §
County of Barnstable            §

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      MERS Modified Form 3022 01/01
—THE COMPLIANCE SOURCE, INC.—                    Page 13 of 14                       14301MA 08/00 Rev. 01/04
www.compliancesource.com                                                            ©2003, The Compliance Source, Inc.

G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

Loan Number: 0202255121

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this 12th day of April, 2005 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to GreenPoint Mortgage Funding, Inc.

(the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:

### 21 Dewey Ave, Provincetown, MA 02657

*[Property Address]*

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

### Waterside ▓▓▓▓▓ Condominium

*[Name of Condominium Project]*

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. Condominium Obligations.   Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code or regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance.   So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then:  (i) Lender waives the provision in Section 3 for the monthly payment to Lender of the yearly premium installments for property insurance on the

---

Multi state Condominium Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3140  01/01
—THE COMPLIANCE SOURCE, INC.—                                  Page 1 of 3                                        14852MU 08/00
www.compliancesource.com                                                                                ©2000, The Compliance Source, Inc.

G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

Pro erty; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of cov rage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

---

G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_____ (Seal)  
Heather Davis                   -Borrower

_____ (Seal)  
Jewel Jones                     -Borrower

_____ (Seal)  
                                -Borrower

_____ (Seal)  
                                -Borrower

[Sign Original Only]

Multistate Condominium Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3140 01/01
—THE COMPLIANCE SOURCE, INC.—                                          Page 3 of 3                                               14502MU 08/00
www.compliancesource.com                                                                                          ©2000, The Compliance Source, Inc.

G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

**EXHIBIT A**

with quitclaim covenants,   Unit #2 of the Waterside Condominium, created by a Master Deed (the "Master Deed") dated December 16, 1985, and filed on December 31, 1985 with the Registry District of Barnstable County of the Land Court as Document No. 383,295, and noted on Certificate of Title No. C195, Plan 40634 B-1.

The post office address of the Condominium is:    Unit 2, Waterside Condominium
                                                  21 Dewey Avenue, Provincetown, MA 02657

The Unit conveyed is laid out as shown on the first Unit Deed, which plan is a copy of a portion of the plans filed with said Master Deed and to which is affixed a verified statement in the form provided in M.G.L. Ch. 183A, Section 9.  It is subject to and with the benefit of the obligations, restrictions, rights and liabilities contained in General Laws Chapter 183A, the Master Deed and By-Laws filed therewith.

The Condominium and each of the Units is intended for residential purposes and other uses permitted by applicable zoning ordinance and as set forth in the Master Deed.

The undivided percentage interest of the Unit conveyed hereunder in the common areas and facilities is .09049%.

For Grantor's title see Certificate of Title No.  C195-2.

Property address:  Unit #2, 21 Dewey Avenue
Provincetown, MA 02657

BARNSTABLE COUNTY
REGISTRY OF DEEDS
A TRUE COPY, ATTEST

JOHN F. MEADE, REGISTER

**BARNSTABLE REGISTRY OF DEEDS**

Loan Number: 0202255121

# NOTE

April 12, 2005                          Provincetown                          MASSACHUSETTS
*[Date]*                                  *[City]*                                  *[State]*

21 Dewey Ave, Provincetown, MA 02657
*[Property Address]*

**1.    BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 146,000.00  (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is GreenPoint Mortgage Funding, Inc..  I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.    INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of  6.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.    PAYMENTS**

(A)  Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payment on the  1st day of each month beginning on  June, 2005.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on  May 1, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 908, Newark, NJ 07101-0908 or at a different place if required by the Note Holder.

(B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $  898.95 .

**4.    BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge.  The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---



GPMWD02022551211 40

## 5.   LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6.   BORROWER'S FAILURE TO PAY AS REQUIRED

### (A)  Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it i  due, I will pay a late charge to the Note Holder. The amount of the charge will be 3.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7.   GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9.   WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**A. Settlement Statement**        U.S. Department of Housing and Urban Development

OMB No. 2502-0265

| B. TYPE OF LOAN | | | | |
|---|---|---|---|---|
| 1. [] FHA    2. [] FmHA    3. [x] Conv. Unins. | | 6. File Number **DAVIS2** | 7. Loan Number **0202255121** | 8. Mortgage Insurance Case Number |
| 4. [] VA    5. [] Conv. Ins. | | | | |

C. NOTE:    This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. NAME OF BORROWER | E. NAME OF SELLER | F. NAME OF LENDER |
|---|---|---|
| Heather Davis<br>21 Dewey Avenue<br>Unit 2<br>Provincetown, MA 02657 | | GreenPoint Mortgage Funding, Inc.<br>100 Wood Hollow Drive<br>Novato, CA 94945 |

| G. PROPERTY LOCATION | H. SETTLEMENT AGENT | I. DATES |
|---|---|---|
| 21 Dewey Avenue<br>Unit 2<br>Provincetown, MA 02657 | Bonaccorso & Associates<br>PLACE OF SETTLEMENT<br>260 Franklin Street,<br>Boston, MA 02110 | SETTLEMENT 4/12/05 |

| J.   SUMMARY OF BORROWER'S TRANSACTION | | K.   SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100.   GROSS AMOUNT DUE FROM BORROWER** | | **400.   GROSS AMOUNT DUE TO SELLER** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 5,336.01 | 403. | |
| 104. Payoff:GreenPoint Mortgage | 41,000.22 | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. | | 408. | |
| 109. | | 409. | |
| 120.   GROSS AMOUNT DUE FROM BORROWER | 46,336.23 | 420. GROSS AMOUNT DUE TO SELLER | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER** | |
| 201. Deposit or earnest money | | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loan (s) | 146,000.00 | 502. Settlement charges to seller | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. | |
| 205. | | 505. | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. | | 512. | |
| 213. | | 513. | |
| 220. TOTAL PAID BY FOR BORROWER | 146,000.00 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER** | | **600. CASH AT SETTLEMENT TO/FROM SELLER** | |
| 301. Gross amount due from borrower (line 120) | 46,336.23 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | (146,000.00) | 602. Less reductions in amount due seller (line 520) | |
| 303. CASH<br>[ ] FROM . [x] TO BORROWER | 99,663.77 | 603. CASH | |

File No. DAVIS2

## L. SETTLEMENT CHARGES

| | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|
| 700. TOTAL SALES/BROKERS COMMISSION | | |
| 701.                    to | | |
| 702.                    to | | |
| 703. Commission paid at settlement | | |
| 704..                         to | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. Loan Origination Fee 1.5%      to GreenPoint Mortgage Funding, Inc. | 2,190.00 | |
| 802. Loan discount              to | | |
| 803. Appraisal Fee              to GreenPoint Mortgage Funding, Inc.    XXXXXXX | 300.00 | |
| 804. Credit Report Fee          to GreenPoint Mortgage Funding, Inc. | 10.50 | |
| 805. Funding Fee                to GreenPoint Mortgage Funding, Inc. | 225.00 | |
| 806. Tax Service Fee            to GreenPoint Mortgage Funding, Inc. | 81.00 | |
| 807. Processing Fee             to GreenPoint Mortgage Funding, Inc. | 370.00 | |
| 808. Flood Cert Fee             to GreenPoint Mortgage Funding, Inc. | 11.00 | |
| 809. Underwriting Fee           to GreenPoint Mortgage Funding, Inc. | 235.00 | |
| 810.                            to | | |
| 811.                            to | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. Interest from 04/18/05 to 05/01/05 @ $25.00 / day | 325.00 | |
| 902. Mortgage insurance premium for    mo.    to | | |
| 903. Hazard insurance premium for      mo.    to | | |
| 904.                                   to | | |
| 905.                                   to | | |
| 906.                                   to | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | |
| 1001. Hazard insurance | | |
| 1002. Mortgage insurance | | |
| 1003. City property taxes | | |
| 1004. County property taxes | | |
| 1005. Aggregate Adjustment | 0.00 | |
| 1006. | | |
| 1007. | | |
| **1100. TITLE CHARGES** | | |
| 1101. Settlement or closing fee    to | | |
| 1102. Abstract or title search     to | | |
| 1103. Title examination            to | | |
| 1104. Title insurance binder       to | | |
| 1105.                              to | | |
| 1106.                              to | | |
| 1107. Attorney's fees              to Bonaccorso & Associates | 600.00 | |
| Includes above items No.: 1101 1102 | | |
| 1108. Title insurance              to First American Title Insurance Company | 323.00 | |
| Includes above items No.: | | |
| 1109. Lender's coverage        $146,000.00          $323.00 | | |
| 1110. Owner's coverage | | |
| 1111.                          to | | |
| 1112.                          to | | |
| 1113. Title Ins. Comm from FATIC $226.10    to B & A for Item 1103 & other core title ser. - POC | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. Recording fees:    Deed $ Mortgage $175.00 Releases $75.00 | 250.00 | |
| 1202. City/county tax/stamps: | | |
| 1203. State tax/st. mps: | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. Federal Express Charges      to Federal Express Company | 54.00 | |
| 1302. RE Taxes due May 1, 2005     to Town of Provincetown | 361.51 | |
| 1303.                              to | | |
| 1304.                              to | | |
| 1305.                              to | | |
| 1306.                              to | | |
| 1307.                              to | | |
| 1308.                              to | | |
| **1400. TOTAL SETTLEMENT CHARGES (entered on lines 103, Section J and 502, Section K)** | 5,336.01 | |

File No. DAVIS2

### CERTIFICATION

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_Heather Lee D_

Heather Davis

BORROWERS                                                                    SELLERS

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this Statement.

_Gaulla_                                                          4/12/05

Bonaccorso & Associates            SETTLEMENT AGENT                          DATE

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**10.    UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
Heather Davis                                -Borrower                                               -Borrower

_____ (Seal)        _____ (Seal)
                                             -Borrower                                               -Borrower

_____                                              [Sign Original Only]
WITNESS

Doc:999,198 04-19-2005 11:18
BARNSTABLE LAND COURT REGISTRY

After recording please return to:

GreenPoint Mortgage Funding, Inc.
*[Company Name]*

*[Name of Natural Person]*

981 Airway Court, Suite E
*[Street Address]*

Santa Rosa, CA, 95403-2049
*[City, State Zip Code]*

_____ *[Space Above This Line For Recording Data]* _____

# MORTGAGE

MIN: 100013802022551214

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)      "Security Instrument" means this document, which is dated April 12, 2005, together with all Riders to this document.

(B)      "Borrower" is Heather Davis  and  Jewel Jones

. Borrower is the mortgagor under this Security Instrument.

(C)      "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D)      "Lender" is GreenPoint Mortgage Funding, Inc..
Lender is a Corporation organized and existing under the laws of the State of New York. Lender's address is 100 Wood Hollow Drive, Novato, CA 94945.

(E)      "Note" means the promissory note signed by Borrower and dated April 12, 2005.
The Note states that Borrower owes Lender One Hundred Forty Six Thousand  and 00/100ths Dollars (U.S. $146,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1, 2035.

---

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3022 01/01
—THE COMPLIANCE SOURCE, INC.—                    Page 1 of 14                       14301MA 08/00 Rev. 02/04
www.compliancesource.com                                                          ©2000, The Compliance Source, Inc.



G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

**(F)** "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(G)** "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H)** "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☒ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ 1-4 Family Rider | ☐ Revocable Trust Rider | |
| ☒ Other(s) [specify] | EXHIBIT A | |

**(I)** "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J)** "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K)** "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L)** "**Escrow Items**" means those items that are described in Section 3.

**(M)** "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N)** "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O)** "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P)** "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items as for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.



of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.   Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are be yond Borrower's control.

**7.   Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property fro m deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.   Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has aba ndoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 7 of 14

MERS Modified Form 3022 01/01
0200L The Compliance Source, Inc.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such

Mass. — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
Page 8 of 14
www.compliancesource.com
MERS Modified Form 3022 01/01
14301MA 08/00 Rev. 04/08
© 2000, The Compliance Source, Inc.

GPMND0022551

repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12.  Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's

G P M N D 0 2 0 2 2 5 5 1 2 1 1 1 1 7

ance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3022 01/01
—THE COMPLIANCE SOURCE, INC.—                                          14301MA 08/00 Rev. 04/08
www.compliancesource.com                                   Page 10 of 14               ©2000, The Compliance Source, Inc.

Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 11 of 14

MERS Modified Form 3022 01/01
14301MA 08/00 Rev. 01/08
©2005, The Compliance Source, Inc.

G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by**



G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waivers.** Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

*[Signatures on Following Page]*

_____ (Seal)
Heather Davis
-Borrower
(Printed Name)

_____ (Seal)
Jerett Jones
-Borrower
(Printed Name)

_____ (Seal)
-Borrower
(Printed Name)

_____ (Seal)
-Borrower
(Printed Name)

_____[Space Below This Line For Acknowledgment]_____

State of MASSACHUSETTS          §
                                §
County of Barnstable            §

Massachusetts Mortgage-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3022 01/01
—THE COMPLIANCE SOURCE, INC.—          ©2000, The Compliance Source, Inc.
Page 13 of 14
www.compliancesource.com

G P M W D 0 2 0 2 2 5 5 1 2 1 1 7

Loan Number: 0282255121

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this 12th day of April, 2005, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to GreenPoint Mortgage Funding, Inc.

(the "Lender")

of the same date and covering the Property described in the Security Instrument and located at:

21 Dewey Ave, Provincetown, MA 02657

*[Property Address]*

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

Waterside Condominium

*[Name of Condominium Project]*

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A.   Condominium Obligations.   Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code or regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B.   Property Insurance.   So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the monthly payment to Lender of the yearly premium installments for property insurance on the

Multistate Condominium Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3140 01/01
—THE COMPLIANCE SOURCE, INC.—                                                                                                                                                                     14502MU 08/00
www.compliancesource.com                                                                                                         ©2000, The Compliance Source, Inc.

Page 1 of 3

GPMWD02022551211

Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C.   Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of cov erage to Lender.

D.   Condemnation. The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E.   Lender's Prior Consent. Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F.   Remedies. If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Multistate Condominium Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 2 of 3
Form 3140 01/01
14502MU 08/00
©2000, The Compliance Source, Inc.

6PMND02O225512111

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_____ (Seal)  
Heather Davis                    -Borrower

_____ (Seal)  
Jewel Jones                      -Borrower

_____ (Seal)  
                                 -Borrower

_____ (Seal)  
                                 -Borrower

*[Sign Original Only]*

Multistate Condominium Rider — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3140 01/01
—THE COMPLIANCE SOURCE, INC.—                                  Page 3 of 3                            14503MU 08/00
www.compliancesource.com                                                                   ©2000, The Compliance Source, Inc.

G P M W D 0 2 0 2 2 5 5 1 2 1 1 1 7

## EXHIBIT A

with quitclaim covenants,     Unit #2 of the Waterside Condominiums, created by a Master Deed (the "Master Deed") dated December 16, 1985, and filed on December 31, 1985 with the Registry District of Barnstable County of the Land Court as Document No. 383,295, and noted on Certificate of Title No. C195, Plan 40634 B-1.

The post office address of the Condominium is:     Unit 2, Waterside Condominium
21 Dewey Avenue, Provincetown, MA 02657

The Unit conveyed is laid out as shown on the first Unit Deed, which plan is a copy of a portion of the plans filed with said Master Deed and to which is affixed a verified statement in the form provided in M.G.L. Ch. 183A, Section 9. It is subject to and with the benefit of the obligations, restrictions, rights and liabilities contained in General Laws Chapter 183A, the Master Deed and By-Laws filed therewith.

The Condominium and each of the Units is intended for residential purposes and other uses permitted by applicable zoning ordinance and as set forth in the Master Deed.

The undivided percentage interest of the Unit conveyed hereunder in the common areas and facilities is .0904%.

. For Grantor's title see Certificate of Title No.  C195-2.

*Property address: Unit #2, 21 Dewey Avenue Provincetown, MA 02657*

BARNSTABLE COUNTY
REGISTRY OF DEEDS
A TRUE COPY, ATTEST

JOHN F. MEADE, REGISTER

**BARNSTABLE REGISTRY OF DEEDS**

Loan Number: 0202255121

# NOTE

April 12, 2005       Provincetown       MASSACHUSETTS
*[Date]*            *[City]*            *[State]*

21 Dewey Ave, Provincetown, MA 02657
*[Property Address]*

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 146,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is GreenPoint Mortgage Funding, Inc.. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on June, 2005. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on May 1, 2035, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 908, Newark, NJ 07101-0908 or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 898.95 .

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

Multistate Fixed Rate Note—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3200 01/01

—THE COMPLIANCE SOURCE, INC.—            Page 1 of 3            12651MU 08/00

www.compliancesource.com            ©2000, The Compliance Source, Inc.



G P M W D 0 2 0 2 2 5 5 1 2 1 1 4 0

5.   **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reducti n will be treated as a partial Prepayment.

6.   **BORROWER'S FAILURE TO PAY AS REQUIRED**

   **(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 3.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

   **(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

   **(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all .he interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

   **(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

   **(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

7.   **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by deliv ring it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

8.   **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us ma be required to pay all of the amounts owed under this Note.

9.   **WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

Multistate Fixed Rate Note—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3200 01/01
—THE COMPLIANCE SOURCE, INC.—                                Page 2 of 3                                    1203TMU 08/00
      www.compliancesource.com                                                                    ©2000, The Compliance Source, Inc.

G P M W D 0 2 0 2 2 5 5 1 2 1 1 4 0

## A. Settlement Statement

U.S. Department of Housing and Urban Development

OMB No. 2502-0265

| B. TYPE OF LOAN | | | | |
|---|---|---|---|---|
| 1. [] FHA    2. [] FmHA    3. [x] Conv. Unins. | | 6. File Number | 7. Loan Number | 8. Mortgage Insurance Case Number |
| 4. [] VA    5. [] Conv. Ins. | | DAVIS2 | 0202255121 | |

C. NOTE:    This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. NAME OF BORROWER | E. NAME OF SELLER | F. NAME OF LENDER |
|---|---|---|
| Heather Davis 21 Dewey Avenue Unit 2 Provincetown, MA 02657 | | GreenPoint Mortgage Funding, Inc. 100 Wood Hollow Drive Novato, CA 94945 |

| G. PROPERTY LOCATION | H. SETTLEMENT AGENT | I. DATES |
|---|---|---|
| 21 Dewey Avenue Unit 2 Provincetown, MA 02657 | Bonaccorso & Associates PLACE OF SETTLEMENT 260 Franklin Street Boston, MA 02110 | SETTLEMENT  4/12/05 |

| J.   SUMMARY OF BORROWER'S TRANSACTION | | K.   SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| 100.   GROSS AMOUNT DUE FROM BORROWER | | 400. GROSS AMOUNT DUE TO SELLER | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 5,336.01 | 403. | |
| 104. Payoff:GreenPoint Mortgage | 41,000.22 | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes | | 406. City/town taxes | |
| 107. County taxes | | 407. County taxes | |
| 108. | | 408. | |
| 109. | | 409. | |
| 120. GROSS AMOUNT DUE FROM BORROWER | 46,336.23 | 420. GROSS AMOUNT DUE TO SELLER | |
| 200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER | | 500. REDUCTIONS IN AMOUNT DUE TO SELLER | |
| 201. Deposit or earnest money | | 501. Excess Deposit (see instructions) | |
| 202. Principal amount of new loan (s) | 146,000.00 | 502. Settlement charges to seller | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. | |
| 205. | | 505. | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes | | 510. City/town taxes | |
| 211. County taxes | | 511. County taxes | |
| 212. | | 512. | |
| 213. | | 513. | |
| 220. TOTAL PAID BY FOR BORROWER | 146,000.00 | 520. TOTAL REDUCTION AMOUNT DUE SELLER | |
| 300. CASH AT SETTLEMENT FROM/TO BORROWER | | 600. CASH AT SETTLEMENT TO/FROM SELLER | |
| 301. Gross amount due from borrower (line 120) | 46,336.23 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | (146,000.00) | 602. Less reductions in amount due seller (line 520) | |
| 303. CASH [ ] FROM . [x] TO BORROWER | 99,663.77 | 603. CASH | |

File No. DAVIS2

## L. SETTLEMENT CHARGES

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| **700. TOTAL SALES/BROKERS COMMISSION** | | | |
| 701. to | | | |
| 702. to | | | |
| 703. Commission paid at settlement | | | |
| 704. to | | | |
| **800. ITEMS PAYABLE IN CONNECTION WITH LOAN** | | | |
| 801. Loan Origination Fee 1.5% to GreenPoint Mortgage Funding, Inc. | | 2,190.00 | |
| 802. Loan discount to | | | |
| 803. Appraisal Fee to GreenPoint Mortgage Funding, Inc. XXXXXX | | 300.00 | |
| 804. Credit Report Fee to GreenPoint Mortgage Funding, Inc. | | 10.50 | |
| 805. Funding Fee to GreenPoint Mortgage Funding, Inc. | | 225.00 | |
| 806. Tax Service Fee to GreenPoint Mortgage Funding, Inc. | | 81.00 | |
| 807. Processing Fee to GreenPoint Mortgage Funding, Inc. | | 370.00 | |
| 808. Flood Cert Fee to GreenPoint Mortgage Funding, Inc. | | 11.00 | |
| 809. Underwriting Fee to GreenPoint Mortgage Funding, Inc. | | 235.00 | |
| 810. to | | | |
| 811. to | | | |
| **900. ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | | |
| 901. Interest from 04/18/05 to 05/01/05 @ $25.00 / day | | 325.00 | |
| 902. Mortgage insurance premium for mo. to | | | |
| 903. Hazard insurance premium for mo. to | | | |
| 904. to | | | |
| 905. to | | | |
| 906. to | | | |
| **1000. RESERVES DEPOSITED WITH LENDER** | | | |
| 1001. Hazard insurance | | | |
| 1002. Mortgage insurance | | | |
| 1003. City property taxes | | | |
| 1004. County property taxes | | | |
| 1005. Aggregate Adjustment | | 0.00 | |
| 1006. | | | |
| 1007. | | | |
| **1100. TITLE CHARGES** | | | |
| 1101. Settlement or closing fee to | | | |
| 1102. Abstract or title search to | | | |
| 1103. Title examination to | | | |
| 1104. Title insurance binder to | | | |
| 1105. to | | | |
| 1106. to | | | |
| 1107. Attorney's fees to Bonaccorso & Associates | | 600.00 | |
| Includes above items No.: 1101 1102 | | | |
| 1108. Title Insurance to First American Title Insurance Company | | 323.00 | |
| Includes above items No.: | | | |
| 1109. Lender's coverage $146,000.00 $323.00 | | | |
| 1110. Owner's coverage | | | |
| 1111. to | | | |
| 1112. to | | | |
| 1113. Title Ins. Comm from FATIC $226.10 to B & A for Item 1103 & other core title ser. - POC | | | |
| **1200. GOVERNMENT RECORDING AND TRANSFER CHARGES** | | | |
| 1201. Recording fees: Deed $ Mortgage $175.00 Releases $75.00 | | 250.00 | |
| 1202. City/county tax/stamps: | | | |
| 1203. State tax/stamps: | | | |
| **1300. ADDITIONAL SETTLEMENT CHARGES** | | | |
| 1301. Federal Express Charges to Federal Express Company | | 54.00 | |
| 1302. RE Taxes due May 1, 2005 to Town of Provincetown | | 361.51 | |
| 1303. to | | | |
| 1304. to | | | |
| 1305. to | | | |
| 1306. to | | | |
| 1307. to | | | |
| 1308. to | | | |
| **1400. TOTAL SETTLEMENT CHARGES (entered on lines 103, Section J and 502, Section K)** | | 5,336.01 | |

File No. DAVIS2

### CERTIFICATION

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

_Heather Lee D_

Heather Davis

BORROWERS                                                                                    SELLERS

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this Statement.

_Bonaccorso & Associates_                    SETTLEMENT AGENT                    4/12/05

Bonaccorso & Associates                    SETTLEMENT AGENT                                    DATE

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**10.** **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

> If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
Heather Davis                   -Borrower                                    -Borrower


_____ (Seal)      _____ (Seal)
                                -Borrower                                    -Borrower

_____
WITNESS

                                             [Sign Original Only]

Multistate Fixed Rate Note—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3200 01/01
—THE COMPLIANCE SOURCE, INC.—      Page 3 of 3      12601MU 08/00
www.compliancesource.com      ©2000, The Compliance Source, Inc.

G P M W D 0 2 0 2 2 5 5 1 2 1 1 4 0